**INTERNATIONAL LIGHT METALS, A DIVISION OF MARTIN MARIETTA TECHNOLOGIES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

Nos. 95–08–01037
Slip. Op. 98–122.

United States Court of International Trade.

Aug. 24, 1998.

Donald F. Beach, Falls Church, VA, for plaintiff.

Frank W. Hunger, Assistant Attorney General of the United States, Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Mikki Graves Walser), Mark G. Nackman, Office of the Assistant Chief Counsel for International Trade Litigation, United States Customs Service, of counsel, for defendant.

## OPINION

CARMAN, Chief Judge.

Plaintiff moves for summary judgment pursuant to U.S. CIT R. 56, contending the United States Customs Service (Customs) improperly denied its protests challenging Customs' refusal to pay in full plaintiff's claims for manufacturing substitution duty drawback. Plaintiff contends its manufacturing operations comply with the statutory and regulatory requirements necessary to receive manufacturing substitution duty drawback pursuant to 19 U.S.C. § 1313(b) (1988). Additionally, plaintiff asserts the partial denial of its drawback claims is contrary to Customs' long-standing administrative practice whereby it approved drawback contracts and paid drawback claims of manufacturers with production processes similar to those of the plaintiff. In a third argument, plaintiff contends this Court should invoke its equitable powers and find Customs is estopped from denying plaintiff's drawback claims because plaintiff detrimentally relied upon Customs' approval of drawback contracts submitted by, and payment of drawback duties to, manufacturers with production processes similar to those of the plaintiff. Finally, plaintiff contends Customs improperly denied its drawback claims because the drawback entries became liquidated by operation of law one year after their filing with Customs pursuant to 19 U.S.C. § 1504(a) (1988).

Defendant cross-moves for summary judgment contending Customs properly denied portions of plaintiff's application for duty drawback. Defendant challenges every argument advanced by plaintiff and asserts it is entitled to the entry of summary judgment in its favor.

This Court has jurisdiction to review Customs' denial of plaintiff's protest pursuant to 28 U.S.C. § 1581(a) (1988) and 19 U.S.C.

§ 1515(a) (1988) (establishing procedures for resolving protests of Customs' "refusal to pay a claim for drawback" filed pursuant to 19 U.S.C. § 1514(a)(6)).

## BACKGROUND

International Light Metals, a Division of Martin Marietta Technologies, Incorporated (ILM), manufactures titanium alloy shapes such as bars, billets, pipes, tubes, angles, channels, and other structural forms. The alloys produced and utilized by ILM combine precise quantities of titanium with other alloying elements such as aluminum, vanadium, iron, copper, and carbon. The titanium utilized in the alloys is obtained from either: (1) titanium sponge, a virtually pure form of titanium;[1] or (2) titanium alloy scrap, consisting of turnings, chips, and solid pieces from prior production runs.

Depending on whether the alloy is produced utilizing only titanium sponge or with a combination of titanium sponge and titanium alloy scrap, alterations must be made in the manufacturing process. When the titanium is obtained from sponge, or titanium alloy scrap consisting of turnings or chips, the titanium-containing inputs are weighed and combined with an appropriate amount of alloying elements. The elements composing the alloy are then compressed into bricks which are welded automatically into an electrode. After the six-hour welding process is completed, the electrode is heated and formed into ingots which are further manufactured into various shapes. In contrast, because recycled solids cannot be compressed into bricks, titanium alloy produced with solid scrap requires a different welding process. Recycled solids are welded manually into an electrode, a process which requires approximately forty hours to complete. After the welding is completed, the electrode is melted in the same fashion as an electrode assembled from bricks of compressed titanium sponge, chips, or turnings and is formed into ingots which are further manufactured into the various shapes.

At issue in this matter is whether ILM is eligible to receive duty drawback on merchandise manufactured with titanium alloy scrap and subsequently exported from the United States.[2] Drawback is the refund of duties paid upon goods previously imported into the United States which are used in the manufacture or production of articles which subsequently are exported. See Kenneth Wolf, *Customs Law & Administration* § 17.1 (3rd ed.1998); see also *Nicholas & Co. v. United States,* 7 U.S.Cust.App. 97, 110, T.D. 36426 (1916), aff'd, 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919). Customs' regulations define drawback as "a refund or remission, in whole or in part, of a customs duty, internal revenue tax, or fee lawfully assessed or collected because of a particular use made of the merchandise on which the duty, tax, or fee was assessed or collected." 19 C.F.R. § 191.2(a) (1994). While the statute provides several different circumstances in which companies may apply for and receive duty drawback, see 19 U.S.C. § 1313(a)—(*l*) (1988), ILM sought to receive manufacturing substitution duty drawback pursuant to 19 U.S.C. § 1313(b), which provides:

**(b) Substitution for drawback purposes**

If imported duty-paid merchandise and duty-free or domestic merchandise of the same kind and quality are used in the manufacture or production of articles within a period not to exceed three years from the receipt of such imported merchandise by the manufacturer or producer of such articles, there shall be allowed upon the exportation of any such articles, notwithstanding the fact that none of the imported merchandise may actually have been used in the manufacture or production of the

---

1. Titanium sponge is a virtually pure form of titanium that is often used as melting stock in producing titanium alloys. ILM's approved drawback contract addressed its use of titanium sponge with a minimum titanium content of 99%. (*See* Pl.'s Ex. 6 at 5.)

2. The parties agree merchandise manufactured solely with titanium sponge is eligible for draw-

back. Indeed, Customs has paid ILM's drawback claims on merchandise manufactured solely with titanium sponge. (*See* Def.'s Stmt. Of Mater. Facts at .2 (noting ILM was paid approximately $200,000 for "the part of the [drawback] claims based on the use of titanium sponge, with the desired alloying materials added, without scrap").)

exported articles, an amount of drawback equal to that which would have been allowable had the merchandise used therein been imported; . . . .

19 U.S.C. § 1313(b) (1988).

■ A precondition to receiving duty drawback is the completion and approval of a drawback contract with Customs. *See* 19 C.F.R. § 191.21(a) ("[E]ach manufacturer or producer of articles intended for exportation with drawback, . . . shall apply for a specific drawback contract by submitting a drawback proposal."). Not surprisingly, the regulations direct that drawback proposals which "comply with the law and regulations" shall be approved by Customs. 19 C.F.R. § 191.23(a) (1994).

With respect to the instant case, ILM submitted a proposed substitution manufacturing drawback contract to Customs on July 26, 1985. Following its review of ILM's proposal, Customs approved the proposed drawback contract on September 3, 1985. *See* T.D. 85–165–(N), 19 Cust. B. & Dec. 392 (1985). ILM's approved drawback contract provided for the substitution of "Titanium Sponge, with a minimum titanium content of 99%" for "Titanium Sponge, with a minimum titanium content of 99%." (Pl.'s Ex. 6 at 5.)

Between October 28, 1985 and November 12, 1987, ILM filed twenty-four drawback claims based on its approved drawback contract, Treasury Decision (T.D.) 85–165–(N). While these claims for duty drawback initially were paid by Customs under the accelerated drawback program, a drawback audit dated February 28, 1988, reported ILM had utilized titanium alloy scrap in its production process and thus failed to satisfy the terms of its approved drawback contract which provided for the substitution of titanium sponge for titanium sponge. Additionally, the audit observed that while ILM's substitution of titanium alloy scrap for titanium sponge "may be correctable by an amendment to the firm's drawback contract," it expressed concern that "the substituted materials may not be the same kind and quality as the designated material" and thus not in conformity with the requirements of 19 U.S.C. § 1313(b). (*See* Def.'s Ex. 3 at 1.) The audit requested further guidance in the form of an "internal advice" as to whether the titanium alloy scrap satisfied the statutory requirement that it be of the same kind and quality as titanium sponge.

In a letter dated July 9, 1990, Customs informed ILM of its determination that titanium alloy scrap was not merchandise of the same kind and quality as titanium sponge. (*See* Pl.'s Ex. 15A at 1 ("We have now received a ruling from [the Office of Regulations and Rulings] stating that, 'The inevitable conclusion is that an alloy scrap, sought to be substituted for *both* its primary metal and its alloying component(s), is not the same kind and quality as the imported pure metal.' ").) As a result, Customs informed ILM that it would be entitled to receive drawback only with respect to those goods manufactured with titanium sponge because goods manufactured with titanium alloy scrap did not meet the same kind and quality requirement of 19 U.S.C. § 1313(b).

Following the issuance of the audit, but prior to Customs' determination that titanium sponge and titanium alloy scrap were not merchandise of the same kind and quality, ILM submitted a proposed revised drawback contract in a letter dated June 19, 1989. The proposed revised contract included language which listed not only titanium sponge as a substitute material, but also listed titanium alloy scrap as a substitute for imported, duty-paid titanium sponge. (*See* Pl.'s Ex. 7 at 2 (listing "[s]crap made with the use of Titanium sponge containing at least 99.3% pure Titanium" as a substitute for use in the production of exported merchandise).) In a letter dated October 10, 1991, following its review of ILM's proposal, Customs informed ILM that the inclusion of titanium alloy scrap as a substitute for titanium alloy sponge did not satisfy the same kind and quality requirement and rejected ILM's proposed revision to its drawback contract. On January 2, 1992, ILM requested that Customs review its rejection of ILM's proposed revised drawback contract. After conducting this review, in a letter dated July 17, 1992, Customs informed ILM that, consistent with its earlier determination, the proposed revised drawback contract failed to satisfy the

statutory requirements for manufacturing substitution drawback.

Between March 12 and June 25, 1993, Customs liquidated the twenty-four entries at issue. The entries were liquidated such that ILM received drawback only on merchandise manufactured with titanium sponge and containing no titanium alloy scrap. ILM filed protests challenging Customs' denial of its claims for duty drawback on items manufactured with titanium alloy scrap on June 8 and August 18, 1993. Customs denied these protests on April 10, 1995, and plaintiff timely filed the present action in this Court challenging Customs' denial of its protests.

## CONTENTIONS OF THE PARTIES

### A. Plaintiff

Plaintiff raises four principal arguments in contending Customs improperly denied its protests challenging the determination it was only entitled to receive drawback on those items manufactured without titanium alloy scrap. First, plaintiff contends Customs wrongly rejected ILM's drawback claims because ILM's use of titanium alloy scrap in manufacturing titanium shapes satisfies the statutory and regulatory requirements established for manufacturing substitution drawback. Plaintiff asserts, "ILM is entitled to drawback because it has adhered to the letter and spirit of the substitution manufacturing law's requirements, particularly [the] same kind and quality [requirement] for imported and substituted merchandise as ... defined in Treasury Decision 82–36." (Pl.'s Mem. in Supp. of Mot. for Summ. J. (Pl.'s Br.) at 7.)

Second, ILM argues that in denying its protests Customs impermissibly departed from its long-established administrative practice of paying duty drawback to producers and manufacturers which used scrap in their production processes. Plaintiff places particular emphasis on T.D. 83–257–K, 17 Cust. B. & Dec. 686 (1983), T.D. 83–257–O, 17 Cust. B. & Dec. 687 (1983), and 83–257–T, 17 Cust. B. & Dec. 688 (1983), asserting Customs' approval of drawback contracts in these three decisions entitles ILM to drawback because ILM's "operations and materials used interchangeably in manufacture track exactly other claimants which were paid drawback on exported titanium alloy products." (Pl.'s Br. at 8.)

Third, ILM contends that it detrimentally relied on Customs' payment of drawback to other manufacturers who used scrap in their production processes and based on this reliance, contends it is entitled to receive drawback. ILM asserts its belief that its use of titanium alloy scrap was similar if not identical to other manufacturers with approved drawback contracts "led it to the well supported belief that its contract would be approved." (Id.) As a result of this belief, ILM asserts it was entitled to notice of Customs' purported shift in interpreting T.D. 82–36 and argues Customs may only deny it drawback prospectively.

Finally, plaintiff asserts it is entitled to receive drawback on those articles manufactured with titanium alloy scrap because its drawback claims became liquidated by operation of law one year after the date of their filing. Plaintiff contends Customs' denial of drawback was inappropriate because the twenty-four drawback entries were liquidated by operation of law, pursuant to 19 U.S.C. § 1504(a), one year after the filing of the drawback entries.

### B. Defendant

Defendant opposes plaintiff's motion for summary judgment and has filed a cross-motion for summary judgment pursuant to U.S. CIT R. 56. Defendant rebuts each contention raised by plaintiff and asserts it is entitled to judgment as a matter of law. Defendant argues ILM is not entitled to drawback because its operations failed to meet the requirements established by the statute as well as the relevant Customs regulations. With respect to the same kind and quality requirements established in 19 U.S.C. § 1313(b), defendant asserts the plaintiff concedes the titanium alloy at issue is not of the same kind and quality as the titanium sponge. (See Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. and in Supp. of Def.'s Cross–Mot. for Summ. J. (Def.'s Br.) at 17.)

Defendant also contends ILM failed to comply with the relevant regulations promul-

gated by the Customs Service. Specifically, defendant raises three arguments for the proposition that ILM's operations do not satisfy the requirements of the substitution manufacturing drawback as embodied in T.D. 82–36. First, defendant contends ILM's operations do not satisfy the requirement of T.D. 82–36 that "use of the different materials does not require significant change in the manufacturing process." (Def.'s Br. at 19 (quoting T.D. 82–36, 16 Cust. B. & Dec. 97, 98 (1982)).) Second, defendant contends T.D. 82–36 requires the isolation of a sought element in order to be eligible for drawback. Defendant argues ILM's use of titanium alloy scrap does not satisfy T.D. 82–36's requirement that "the sought element must be isolated in its pure form in the manufacturing process." (Def.'s Br. at 21–22.) Finally, defendant argues ILM's use of titanium alloy scrap doesn't satisfy T.D. 82–36 because ILM's operations sought to use *all* the elements in the titanium alloy, rather than just a single element as in T.D. 82–36.

The second principal argument raised by defendant asserts ILM is not entitled to manufacturing substitution drawback because no administrative practice exists which would entitle ILM to receive drawback based on its operations. Defendant challenges ILM's contention that three approved drawback contracts (T.D. 83–257–K, T.D. 83–257–O, and T.D. 83–257–T) are sufficient to demonstrate the existence of a long-standing administrative practice.

Third, defendant asserts ILM is not entitled to drawback on the basis of estoppel or detrimental reliance. Defendant contends estoppel and detrimental reliance are equitable doctrines that do not operate against the government in cases in which the government is acting in its sovereign capacity. Defendant maintains because this case involves the collection or refund of customs duties on imports and the application and enforcement of Customs' regulations, plaintiff may not assert equitable principles against the government. Additionally, defendant argues plaintiff is not entitled to assert equitable principles against the government because plaintiff does not have clean hands due to its admitted breach of its approved drawback contract.

Finally, defendant challenges plaintiff's argument that the twenty-four drawback entries at issue were liquidated by operation of law pursuant to 19 U.S.C. § 1504(a) (1988). Defendant specifically notes a relevant regulation which provides the provisions of 19 U.S.C. § 1504(a) "shall not apply to ... drawback entries." 19 C.F.R. § 159.11(b) (1986). Additionally, defendant points to subsequent legislative history that specifically states, "there is no statutory time limitation for the liquidation of drawback claims." (Def.'s Br. at 42 (citing H.R. Rept. 103–361, at 132 (1993), *reprinted in* 1993 U.S.C.C.A.N. 2552, 2682).)

STANDARD OF REVIEW

■ This case is before the Court on cross-motions for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." U.S. CIT R. 56(d). "The Court will deny summary judgment if the parties present a dispute about a fact such that a reasonable trier of fact could return a verdict against the movant." *Ugg Int'l, Inc. v. United States,* 17 CIT 79, 83, 813 F.Supp. 848, 852 (1993) (quotation and citation omitted). When appropriate, summary judgment is a favored procedural device to "secure the just, speedy, and inexpensive determination" of an action. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed. Cir.1987) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)) (internal quotations omitted). The parties agree, and this Court finds, there are no genuine issues as to any material facts in this matter. Accordingly, the Court may properly resolve this matter by summary judgment.

DISCUSSION

1. **ILM's Entitlement to Drawback Based on Compliance with the Applicable Statutory and Regulatory Requirements**

■ Plaintiff first contends it is entitled to receive manufacturing substitution duty

drawback because "ILM's operations and materials used fall within the letter and spirit" of the applicable statutory and regulatory requirements. (Pl.'s Br. at 20 (emphasis omitted).) Specifically, ILM contends its operations comply with the requirements of T.D. 82–36, which establishes parameters on materials which when used in stoichiometric substitution satisfy the "same kind and quality" requirement of 19 U.S.C. § 1313(b). Defendant challenges this assertion and contends plaintiff's operations do not satisfy either the statutory or regulatory requirements for substitution manufacturing drawback.

Initially, the Court notes that neither the statute nor Customs' regulations provide any helpful guidance on the meaning of "same kind and quality" in 19 U.S.C. § 1313(b). The statute contains no definition of the term, and the definition provided by the regulations is unhelpful. *See* 19 C.F.R. § 191.2(m) (1989) (" 'Same kind and quality merchandise' means merchandise which may be substituted under substitution drawback."). While the statute and regulations provide little, if any, guidance as to the meaning of the statutory term "same kind and quality", Customs has addressed materials it will consider to satisfy the statutory requirement of "same kind and quality" in a published ruling. *See* T.D. 82–36, 16 Cust. B. & Dec. 97 (1982).

The introductory sentence of T.D. 82–36 states, "[u]nder the drawback law (19 U.S.C. 1313(b)) drawback contracts have been approved since 1958, permitting the substitution of one domestic compound for a different imported compound when *an identical element* is sought for use in manufacturing an exported article." 16 Cust. B. & Dec. at 97 (emphasis added). T.D. 82–36 goes on to note, "substitution is allowed of primary source materials to obtain *a sought element* . . . , if use of the different materials does not require significant change in the manufacturing process." *Id.* at 98 (emphasis added). The Court finds these two excerpts clearly

express Customs' determination that scrap materials used in a stoichiometric substitution manufacturing process satisfy the statute's same kind and quality requirement only where a single "sought element" contained in the scrap appears in the finished product.[3]

Plaintiff contends ILM's operations meet the requirements of T.D. 82–36 concerning stoichiometric substitution and thus satisfy the statute's same kind and quality requirement. In support of this argument, plaintiff makes two assertions. First, plaintiff contends T.D. 82–36 should be interpreted to authorize drawback where scrap is used "as a source material which can be used to obtain a single sought element *upon which drawback is based.*" (Pl.'s Br. at 7.) Second, plaintiff argues because the titanium contained in titanium sponge is identical to the titanium contained in alloy scrap, substitution of alloy scrap for sponge satisfies the statute's same kind and quality requirement. Plaintiff characterizes ILM's operations as "substitut[ing] the titanium in the sponge for the *titanium* in the scrap for drawback." (*Id.* at 20 (emphasis omitted).)

Because the Court finds ILM's utilization of titanium alloy scrap in its manufacturing process does not comply with T.D. 82–36's requirement that only a single "sought element" be extracted from the scrap, plaintiff's first argument is rejected. ILM's utilization of titanium alloy scrap in its manufacturing process results in more than a single "sought element" appearing in the finished product. Not only is titanium sought, but as plaintiff notes, "other alloying elements [contained in the titanium alloy scrap] appear in the finished shapes." (Pl.'s Br. at 45.) This is inconsistent with T.D. 82–36's clear statement that only stoichiometric substitutions which result in a single sought element appearing in the finished product satisfy the statute's same kind and quality requirement. The Court is not persuaded by plaintiff's contention that it should interpret the term "sought element" in T.D. 82–36 to mean a

**3.** Defendant also maintains T.D. 82–36 requires the sought element "must be isolated in its pure form in the manufacturing process." (Def.'s Br. at 21–22.) While T.D. 82–36 clearly discusses a hypothetical fact pattern involving the substitution of cuprite for chalcacite as a source of copper, the Court can find no language in T.D. 82–36 requiring isolation of the sought element in its pure form during the manufacturing process.

"sought element upon which drawback is based." T.D. 82–36 makes no such distinction, and the Court finds no basis in the clear language of T.D. 82–36 for the interpretation asserted by ILM.[4]

Additionally, the Court rejects plaintiff's second argument that ILM's utilization of titanium alloy scrap satisfies the requirements of T.D. 82–36 because titanium obtained from the alloy scrap is of the same kind and quality as titanium obtained from sponge. The Court rejects this argument for much the same reason expressed in the previous paragraph. While plaintiff is undoubtedly correct that the titanium contained in the two different source materials (sponge and scrap) is identical, plaintiff's argument fails to account for the fact that ILM's utilization of titanium alloy scrap results in more than a single "sought element" appearing in the final product. As noted above, other elements such as aluminum, vanadium, iron, oxygen, copper, and carbon appear both in the titanium alloy scrap as well as in the finished product gainsaying T.D. 82–36's requirement that only a "sought element" obtained by stoichiometric substitution will satisfy the statute's same kind and quality requirement.

Finally, the Court rejects plaintiff's contention that it has a vested right to drawback. The case law clearly establishes an applicant's ability to receive drawback is conditioned upon compliance with the relevant statutory and regulatory requirements. *See Romar Trading Co., Inc. v. United States*, 27 Cust. Ct. 34, 37, C.D. 1344 (1951) ( "The right to recover drawback ... arises only when all of the provisions of the statute and the applicable and lawful regulations prescribed under its authority have been complied with."). Prior to the claimants exporting the goods in compliance with the applicable statutory and regulatory requirements, the claimant has only an "inchoate right, or a 'right accruing'" which may become an absolute right. *General Motors Corp. v. United States*, 32 Cust.

Ct. 94, 97, C.D. 1587 (1954); *cf. Romar Trading*, 27 Cust. Ct. at 37 ("Until the privilege has been ripened into a right to recover, it may be regulated or even so circumscribed by the Congress as to be impossible of utilization....."). Because plaintiff never obtained an approved drawback contract permitting the substitution of titanium alloy scrap for titanium sponge and because its manufacturing operations did not satisfy the requirements of T.D. 82–36, contrary to its assertion, ILM never obtained a vested right to drawback.

### 2. Existence of an Administrative Practice Regarding Same Kind and Quality Merchandise

■ In the alternative, plaintiff argues if this Court finds ILM's operations do not satisfy the statutory and regulatory requirements for manufacturing substitution drawback, this Court should nevertheless find Customs had an administrative practice of paying drawback to claimants with manufacturing operations utilizing titanium alloy scrap in a manner similar or identical to ILM. Plaintiff claims an "entitlement [to drawback] ... from Customs long established administrative practice/position of paying drawback on sought metals obtained from scrap." (Pl.'s Br. at 36 (citing T.D. 83–257–K, 17 Cust. B. & Dec. 686 (1983); T.D. 83–257–O, 17 Cust. B. & Dec. 687 (1983); T.D. 83–257–T, 17 Cust. B. & Dec. 688 (1983); T.D. 91–45–I, 25 Cust. B. & Dec. 101 (1991)).) Defendant responds by asserting the abstracted drawback contracts cited by the plaintiff "are insufficient to show a long standing administrative practice." (Def.'s Br. at 31.) Defendant maintains plaintiff's citation of the published abstracted drawback contracts at most establishes the contracts were approved, but asserts the approval is of little relevance because "Customs still required that the claims be consistent and in compliance with the applicable statutes, reg-

---

**4.** Additionally, the Court notes ILM's use of titanium alloy solids requires alterations to the manufacturing process which are contrary to T.D. 82–36's requirement that the use of scrap may not "require [a] significant change in the manufacturing process." T.D. 82–36, 16 Cust. B. &

Dec. 97, 98 (1982). As noted in Customs' 1988 Audit Report on ILM's operations, solid pieces of titanium alloy "bypass one step entirely (compression) and perform a different kind of another process (welding) which takes a longer period of time to complete." (Pl.'s Ex. 3 at 6.)

ulations and the terms of the individual contracts." (*Id.* at 32.)

Plaintiff relies on the decisions in *United States v. International Paint Co.,* 35 C.C.P.A. 87, C.A.D. 376 (1948), *Joshua Hoyle & Sons v. United States,* 25 C.C.P.A. 128, T.D. 49244 (1937), and *John J. Coates v. United States,* 3 Cust. Ct. 193, C.D. 232 (1939), in contending Customs should not be able to deviate from what plaintiff asserts is its long-standing administrative practice of paying drawback to manufacturers which utilize titanium alloy scrap in their production processes. While plaintiff is correct that opinions issued by the predecessors of this Court and the Court of Appeals for the Federal Circuit addressed the extent to which Customs may be bound by its long-standing administrative practices, plaintiff's brief does not provide any discussion or analysis of more recent opinions which build upon and expand the earlier analysis of Customs' long-standing administrative practices.

An analysis of the more recent opinions discloses two significant principles useful in evaluating ILM's argument. First, a line of cases addresses actions, which when taken by Customs, provide the basis for finding the existence of an administrative practice, as well as those actions which are not sufficient to establish a binding precedent. In *Borneo Sumatra Trading Co., Inc. v. United States,* 56 Cust. Ct. 166, C.D. 2624 (1966), the Customs Court determined abstracted classification rulings published in the Treasury Decisions were not "decisions" which bound the government. The Court noted, "it is clear that an abstract of a decision is not a decision" and that "[t]o take an abstract for a decision is like taking a headnote for a court opinion." *Id.* at 173 (footnote omitted). The Court emphasized the existence of a regulation that provided classification rulings were binding only upon the "publication of a decision, not by an abstract" in concluding an abstracted classification ruling was not binding on the government. *Id.* at 174. With respect to the instant matter, ILM relies on abstracts of drawback contracts published in the Customs Bulletin in 1983 and 1991. An application of the *Borneo Sumatra Trading Company* decision to the matter before the Court undercuts plaintiff's assertions that abstracts of drawback contracts published in the Customs Bulletin result in a binding, long-standing administrative practice of the Customs Service.

This conclusion is bolstered by the decision in *Ditbro Pearl Co., Inc. v. United States,* 62 C.C.P.A. 95, 96, 515 F.2d 1157 (1975), in which the United States Court of Customs and Patent Appeals determined an abstracted Customs Service decision relied on by the appellant was not a "published decision" which established a binding uniform administrative practice. The Court determined abstracted classification rulings published in the Customs Bulletin "are published as a matter of information and guidance and not for the purpose of establishing a[n] [administrative] practice." *Id.* (internal quotation omitted). Thus, this Court rejects plaintiff's contention the publication of abstracted drawback contracts in T.D. 83–257–K, T.D. 83–257–O, T.D. 83–257–T, and T.D. 91–45–I creates a binding administrative practice on Customs.

Second, a more recent case illuminates the circumstances under which a court may find Customs bound to an administrative practice which is not the result of a published finding by the Secretary of the Treasury. In *Heraeus–Amersil, Inc. v. United States,* 9 CIT 412, 417–18, 617 F.Supp. 89, 94–95 (1985), *aff'd,* 4 Fed. Cir. (T) 95, 795 F.2d 1575 (1986), this Court determined even where a *de facto* uniform and established administrative practice existed in the absence of a published ruling, Customs could abandon such a practice without publishing notice of its intention to change its practice, so long as importers operating under that practice had notice of the change. With respect to ILM, its amended drawback contract submitted in 1989 proposing to substitute titanium alloy scrap for titanium sponge was never approved by Customs. Thus, even if the Court were to find Customs, without the existence of a published decision, did have a long-standing administrative practice of paying drawback to manufacturers utilizing titanium alloy scrap in their production processes, Customs would be entitled to change its practice without notification to ILM because

ILM had not previously been operating under an approved contract providing drawback where titanium alloy scrap was substituted for titanium sponge. In any event, the Court finds plaintiff has failed to prove Customs had such a uniform and established administrative practice of paying drawback to manufacturers utilizing titanium alloy scrap in a manner which did not meet the requirements of T.D. 82–36.

### 3. ILM's Entitlement to Drawback Based on Detrimental Reliance

■ Plaintiff's penultimate argument requests this Court exercise its equitable powers and find ILM entitled to receive drawback on the articles it manufactured with titanium alloy scrap based on its detrimental reliance on Customs' approval of drawback contracts submitted by third-party manufacturers which utilized titanium alloy scrap in their production processes. In support of this request, plaintiff points to the provisions codified in 19 C.F.R. 177.9(e)(2) (1991).[5] That regulation provides parties affected by modification of a Customs' ruling letter may obtain a delay in the effective date of the change if they can establish "the treatment previously accorded by Customs to the substantially identical transactions was sufficiently consistent and continuous that such party reasonably relied thereon in arranging for future transactions." 19 C.F.R. 177.9(e)(2) (1991). Defendant argues this Court should reject plaintiff's detrimental reliance claim and asserts equitable remedies may be awarded against the government only in circumstances where the government is not acting in its sovereign capacity. Defendant claims the collection of tariffs and revenues is a sovereign function, and therefore equitable remedies are not available to the plaintiff in this matter.

Plaintiff frames its argument in terms of "detrimental reliance", which traditionally requires an offer of unilateral contract. See Black's Law Dictionary 451 (6th ed.1990) (defining detrimental reliance as a "[r]esponse by promisee by way of act to offer of promisor in a unilateral contract"). Plaintiff's papers do not contend Customs directly gave it reason to believe its amended drawback contract, which proposed the substitution of titanium alloy scrap for titanium sponge, would ever be approved. Rather, plaintiff's papers suggest ILM inferred Customs' approval of its proposed amended drawback contract based on Customs' approval of drawback contracts submitted by third-parties, which plaintiff alleges involved manufacturing operations utilizing titanium alloy scrap in a manner similar to ILM. Plaintiff asserts, "[t]he record is replete with ILM's claims that others were accorded the treatment sought by it for more than two years prior to Customs [sic] first refusal to approve ILM's replacement contract." (Pl.'s Br. at 46.)

The Court finds the record contains no evidence Customs ever suggested ILM would be able to receive drawback on items manufactured with titanium alloy scrap and concludes there was no offer upon which plaintiff possibly could have detrimentally relied. Indeed, the Court finds plaintiff's use of the term "detrimental reliance" imprecise and interprets many of the plaintiff's arguments to be akin to its assertions concerning the existence of a long-standing administrative practice.

Additionally, the Court notes the regulations specifically foreclose ILM's reliance on Customs' approval of third-party drawback contracts which may have permitted the substitution of titanium alloy scrap for titanium sponge for drawback purposes. See 19 C.F.R. 177.9(c) (1991) ("[N]o other person

---

5. Plaintiff's brief also relies on 19 U.S.C. § 1625(c)(2) (1994) (requiring Customs to provide notice and opportunity to comment on determinations which "have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions"). This provision was enacted into law as part of the North American Free Trade Agreement Implementation Act of 1993, Pub.L. No. 103–182, § 623, 107 Stat.2057, 2186 (1993). Because this provision was added to the statute after the events in issue occurred, the Court will disregard this aspect of plaintiff's argument. Additionally, the Court notes the statutory provision in effect prior to 1993 provides little, if any, assistance to plaintiff's arguments. See 19 U.S.C. § 1625 (1988) (providing "precedential decision[s] (including any ruling letter, internal advice memorandum, or protest review decision)" issued by the Customs Service shall be published in the Customs Bulletin or made available to the public).

should rely on the ruling letter or assume that the principles of that ruling will be applied in connection with any transaction other than the one described in the letter.").

Finally, the Court of Appeals for the Federal Circuit addressed the binding effect of a ruling letter issued to a third-party in *Superior Wire v. United States*, 7 Fed. Cir. (T) 43, 867 F.2d 1409 (1989). In that decision, the Court determined a ruling letter issued to a third-party cannot be relied upon as a binding agency practice or finding. *See Superior Wire*, 7 Fed. Cir. (T) at 47, 867 F.2d at 1413. Because plaintiff never had reason to believe it would be entitled to substitute scrap and because the regulations preclude reliance on Customs ruling letters issued to third-parties, the Court rejects plaintiff's detrimental reliance claim.

### 4. ILM's Entitlement to Drawback Based on Liquidation by Operation of Law

 Finally, plaintiff argues the twenty-four entries at issue became liquidated by operation of law, pursuant to 19 U.S.C. § 1504(a),[6] one year after ILM filed its drawback entries. Plaintiff challenges Customs' promulgation of the regulation embodied in 19 C.F.R. § 159.11(b), which provides the deemed liquidation provisions of 19 U.S.C. § 1504(a) do not apply to drawback entries, contending Customs' regulation is contrary to Congress' expressed intent of " 'increas[ing] certainty in the customs process for importers, surety companies, and other third parties with a potential liability relating

to a Customs transaction.' " (Pl.'s Br. at 52 (quoting S.Rep. No. 95–778, at 32 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2211, 2243).) Plaintiff also contends the omission of drawback entries from coverage in 19 U.S.C. § 1504(a) was a result of Congressional drafting error, and urges this Court to find § 1504(a) applicable to drawback entries. Defendant responds by asserting Customs' properly promulgated its regulation that specifically provides the deemed liquidation provision in 19 U.S.C. § 1504(a) does not apply to drawback entries and Customs' policy of not applying the limitations expressed in § 1504(a) to drawback entries is a long-established administrative practice that Congress did not alter or eliminate when it approved the Customs Modernization Act of 1993.

Initially, the Court notes the statute specifically grants the Secretary of the Treasury broad authority to implement regulations relating to the payment of drawback. *See* 19 U.S.C. § 1313(*l*) (1988) ("Allowance of the privileges provided for in this section shall be subject to compliance with such rules and regulations as the Secretary of the Treasury shall prescribe, . . . [including] the fixing of a time limit within which drawback entries or entries for refund . . . shall be filed and completed. . . ."). Plaintiff's challenge is directed at Customs' interpretation of the statute contained in a regulation promulgated in 1978. *See Proposed Rule: Entry of Merchandise and Liquidation of Entries*, 43 Fed.Reg. 55,774, 55,780 (Dep't Treas.1978); T.D. 79–221,[7] 13 Cust. B. & Dec. 642, 650,

---

6. The statute, in relevant part, provides:
 **(a) Liquidation**
 [A]n entry of merchandise not liquidated within one year from:
 (1) the date of entry of such merchandise;
 . . .
 shall be deemed liquidated at the rate of duty, value, quantity, and amount of duties asserted at the time of entry by the importer of record. . . .
 19 U.S.C. § 1504(a) (1988).

7. In promulgating the regulations concerning the applicability of § 1504, Customs relied on the authority of the Secretary of the Treasury to promulgate necessary rules pursuant to 19 U.S.C. §§ 66, 1624. *See Proposed Rule: Entry of Merchandise and Liquidation of Entries*, 43 Fed. Reg. 55,774, 55,781 (Dep't Treas.1978). Those

sections of the statute provide the Secretary of the Treasury with the authority to "prescribe . . . rules and regulations not inconsistent with law, to be used in carrying out the provisions of law relating to raising revenue from imports, . . . and shall give such directions to customs officers and prescribe such rules and forms to be observed by them as may be necessary for the proper execution of the law", and to "make such rules and regulations as may be necessary to carry out the provisions of this chapter." 19 U.S.C. §§ 66, 1624. " 'It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress.' " *CPC International, Inc. v. United States*, 933 F.Supp. 1093, 1102 (CIT 1996) (quoting *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988)).

692, 739 (1979) (codified in relevant part at 19 C.F.R. § 159.11). In that regulation, Customs took the position that the deemed liquidation provision in 19 U.S.C. § 1504(a) "do[es] not include ... drawback entries." 43 Fed.Reg. at 55,780. *See also* T.D. 79–221, 13 Cust. B. & Dec. at 650 (same).[8]

The Court finds the statutory language does not express clearly whether the deemed liquidation provision codified at 19 U.S.C. § 1504(a) applies with respect to drawback entries. The statutory language does, however, suggest it applies only to imports. Specifically, the statute's reference to a single "entry of merchandise" appears to refer to entries of goods which remain in the United States, rather than drawback entries which are imported and subsequently exported from the United States. The legislative history offers little guidance on the scope of the statute's applicability, simply stating 19 U.S.C. § 1504(a) applies with respect to "entr[ies]," "importation[s]," and "importer[s]." S.Rep. No. 95–778, at 4, 31–32 (1978); H.R. Conf. Rep. No. 95–1517, at 16 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2211, 2215, 2242–43, 2258. While these terms might arguably relate to drawback claims, the Court believes a better reading would exclude drawback entries from the scope of 19 U.S.C. § 1504(a). The central focus of drawback occurs when merchandise containing eligible inputs is exported, and it is not until the goods are exported that a claimant becomes eligible to receive drawback. As plaintiff observes, "the amount of drawback depends on the amount of duty paid on imported merchandise that is used or not used in this country and then exported or destroyed." (Pl.'s Br. at 51.)

Given the ambiguity of the statute and the broad grant of authority provided to the Secretary of the Treasury pursuant to 19 U.S.C. § 1313(*l*), the Court finds Customs' promulgation of 19 C.F.R. 159.11(b), determining that § 1504(a) is not applicable to drawback entries, is reasonable. *See Chevron U.S.A., Inc. v. Natural Resources De-*

*fense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (reviewing court determines reasonableness of agency's statutory interpretation where statute is ambiguous). The Court's conclusion is bolstered by the fact that 19 C.F.R. 159.11(b) reflects a long-standing administrative practice of the Customs Service that has not been altered by Congress. *See, e.g., Zenith Radio Corp. v. United States,* 437 U.S. 443, 457, 98 S.Ct. 2441, 2448–49, 57 L.Ed.2d 337 (1978).

Finally, plaintiff's contends "[t]he failure to refer in section 1504 to other entries, which involve entries of merchandise directly, but are not consumption entries, should be attributed to drafting error in the legislative process." (Pl.'s Br. at 55.) Had Congress explicitly intended the deemed liquidation provisions of 19 U.S.C. § 1504(a) to apply to drawback entries, it would have included the appropriate language. The Court rejects plaintiff's drafting error argument, finding there is no suggestion of any intention to include drawback entries within the scope of § 1504(a).

### CONCLUSION

For the reasons stated above, the Court finds Customs properly denied, in part, plaintiff's claims for manufacturing substitution duty drawback. Plaintiff's motion for summary judgment is denied, and the defendant's cross-motion for summary judgment is granted.

### JUDGMENT ORDER

This matter having been duly submitted for decision and this Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision it is hereby

**ORDERED** that plaintiffs' Motion for Summary Judgment is denied; and it is further

---

**8.** The regulation, as codified, in its entirety provides:

 (b) *Applicability.* The provisions of this section and § 159.12 shall apply to entries of merchandise for consumption or withdrawals of mer-

chandise for consumption made on or after April 1, 1979, but shall not apply to vessel repair entries or drawback entries.
19 C.F.R. § 159.11(b) (1991).

ORDERED that the defendant's Cross–Motion for Summary Judgment is granted.